UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CHERYL A. LEWIS,

               Plaintiff,

       v.

KALEIDA HEALTH,

               Defendant.

20-CV-1860-LJV
DECISION & ORDER

_____

On December 16, 2020, the plaintiff, Cheryl A. Lewis, commenced this action, alleging that the defendant, Kaleida Health ("Kaleida"), discriminated against her on the basis of gender, age, and disability in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); the Age Discrimination in Employment Act of 1967 ("ADEA"); and the Americans with Disabilities Act of 1990 ("ADA").[1] Docket Item 1. She also alleges that Kaleida retaliated against her in violation of the ADA and Title VII. *Id.* On February 19, 2021, Kaleida moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), Docket Item 8; on April 26, 2021, Lewis responded, Docket Item 11; and on May 7, 2021, Kaleida replied, Docket Item 12.

For the following reasons, Kaleida's motion to dismiss is granted in part, and the remainder of the motion will be granted unless Lewis amends her complaint to correct the deficiencies noted below.

---

[1] The complaint also alleges that Kaleida discriminated and retaliated against Lewis in violation of the New York State Human Rights Law ("NYSHRL"). Docket Item 1. Kaleida moved to dismiss Lewis's NYSHRL claims under Federal Rule of Civil Procedure 12(b)(1), Docket Item 8, and Lewis withdrew those claims, Docket Item 11.

**FACTUAL BACKGROUND**

Lewis was hired by Kaleida in December 1996 and rehired as a family nurse practitioner ("NP") in November 1997.[2]  Docket Item 1 at ¶ 1.[3]  In November 2017, Kaleida transferred Lewis to the Gates Vascular Institute ("Gates Vascular"), and Lewis began working with Kishor Phadke, M.D., as her collaborating physician.  *Id.* at ¶ 10.  At the time of her transfer, Lewis was about 60 years old.  *Id.* at ¶ 2.  Lewis also had been diagnosed with "chronic migraines and cervicalgia," but she was qualified for and "able to perform the essential duties of her job with reasonable accommodations."  *Id.* at ¶¶ 3-4.

Starting on Lewis's first day at Gates Vascular, the other nurses began "targeting her."  *Id.* at ¶ 13.  For example, they "began debating in front of [Lewis] whose responsibility" it would be to train her, "speaking as though it was a significant burden."  *Id.*  "The NPs ultimately drew straws to decide who would have to train" Lewis.  *Id.*  Nurse Andrea Daniel-Sanders "drew the short straw"; she "spent most of [her] time training [Lewis] on [the] phone and outwardly showed no desire to train [Lewis] properly."  *Id.* at ¶ 14.

---

[2] On a motion to dismiss, the Court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff."  *Trustees of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016) (citing *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014)).

[3] The complaint contains duplicative paragraph numbers 1 through 9.  All citations are to the second set of paragraph numbers, which start in the factual background section on page 2, except for those specifically designated as "(1)."

Lewis "received minimal training from her colleagues." *Id.* at ¶ 14. This impacted Lewis's work most significantly in "the Lab." *Id.* at ¶ 20. "The other NPs would not allow [Lewis] to take Lab shifts during training." *Id.* "One particular [n]urse would control the assignments and regularly work in the Lab while also refusing to train [Lewis]." *Id.* Lewis complained about the lack of lab training, but "[t]his complaint went completely unaddressed by [Kaleida] and [Lewis's manager, Samantha] Palisano." *Id.*

Eventually, Lewis was able to work in "the Lab," but she was provided with only "two days of training," which was "insufficient." *Id.* at ¶ 21. "She was then told to work the Lab alone, despite [her] multiple complaints to [m]anagement of the complete lack of training she received." *Id.* Because Lewis was not properly trained, a mistake "[i]nevitably . . . occurred." *Id.* at ¶ 22. Lewis "was called into Manager Palisano's office and was told there were complaints about her post op [sic] reports." *Id.* Despite her prior complaints about insufficient training, Lewis had to explain to Palisano why she made errors on those reports. *Id.*

Lewis's "age was, in part, the cause of the [NPs'] actions against [her]." *Id.* at ¶ 6. "At the time of [Lewis's] transfer to [Gates] Vascular [], she became the most senior nurse" and "the third oldest [n]urse [p]ractitioner in the department." *Id.* at ¶ 12. Senior nurses receive certain benefits, "such as vacation priority," *id.* at ¶ 6, and the other NPs "constantly [] badgered" Lewis "to in put [sic] her vacation time," *id.* at ¶ 15.

Lewis also experienced other issues with her colleagues. For example, she "did not receive a designated work area," and her "belongings would be pushed off her workspace by Nurse Tracee Heaton." *Id.* The other NPs "denied [Lewis] lunch breaks." *Id.* at ¶ 16. When Lewis complained to Palisano about this, "she was advised to ask

Nurse [] Daniel-Sanders [for] relie[f] [] at 3:00 pm, after [Daniel-Sanders's] union work." *Id.* Lewis "did as she was told," but Daniel-Sanders told Lewis that her "union time d[id not] end until 3:30 pm." *Id.* "At 4:00 pm, [] Daniel-Sanders approached [Lewis] and asked, 'what do you want?'" *Id.* By 4:00 pm, Lewis was ten hours into her shift and "did not have time to take a break for lunch and conclude her work for the day." *Id.* Kaleida later told Lewis "that she would be disciplined if she did not take her lunch break." *Id.* at ¶ 17.

Lewis "made . . . multiple verbal complaints regarding the [NPs'] refusal to train her and harassment" to Kaleida. *Id.* at ¶ 6. She specifically told Palisano about the lack of training "as well as the discriminatory hostile environment she was being subjected to at the conclusion of her orientation." *Id.* at ¶ 18. But "Palisano did nothing to address [Lewis's] complaint and refused [to give Lewis] further training." *Id.* at ¶ 19.

In general, Kaleida did not support Lewis, which "left [Lewis] . . . to believe [that Kaleida] was targeting her and setting her up to fail." *Id.* at ¶ 23. Kaleida's only remedy for Lewis was to send her "back to the same NPs who were harassing and targeting her to confront them about the issue[s] of her lunch breaks and lack of training." *Id.* at ¶ 24. This caused Lewis "anxiety and stress[,] exacerbating" her chronic migraines and cervicalgia. *Id.*

Lewis also "witnessed disparate treatment regarding attendance." *Id.* at ¶ 25. More specifically, "[a] male co-worker, John Hawk, was leaving early during his shift and affecting other's [sic] work." *Id.* Lewis "reported this to [Kaleida's] [m]anagement." *Id.* The next time that Lewis was with Hawk, "he left early but right before leaving, stood over [Lewis] in an intimidating manner as if to see if she had something to say to him

about it." *Id.* at ¶ 26. "It was a physically threatening situation caused by the complaint [Lewis] made." *Id.* at ¶ 27. Lewis reported this incident, but Kaleida "did nothing to address the situation." *Id.* at ¶ 28.

Lewis noticed additional disparate treatment when Daniel-Sanders brought "her high school aged child [sic] into work with her, violating HIPPA [sic]." *Id.* at ¶ 29. Lewis complained to Kaleida about this and later "heard her co-workers refer to her as the 'snitch.'" *Id.* at ¶¶ 29-30. "[Lewis] was being dissuaded from raising further complaints." *Id.* at ¶ 31.

Another incident occurred in winter 2018. *Id.* at ¶ 32. A "VIP patient" had arrived in Lewis's "pod," and Lewis was told that "Dr. Iyer wanted the patient upstairs immediately." *Id.* at ¶ 32. Lewis "put the order in but saw there was no [h]istory or [p]hysical in the chart." *Id.* She told Johnson Scaria, director of the "Cath Lab," that she needed to "complete the [history and physical] before transferring the patient." *Id.* "Johnson told [Lewis that] he would call Dr. Iyer to tell him." *Id.* at ¶ 33. Johnson then told Lewis that "Dr. Iyer said the patient was seen the day before in the ER[,] and he would 'take care of it.'" *Id.* Despite all that, "[i]t was later reported [that Lewis] refused to do a [h]istory and [p]hysical for Dr. Iyer." *Id.* at ¶ 34.

"Around this time[,] in early 2019, [Lewis] noticed her collaborating physician, Dr. Phadke[,] treating her differently." *Id.* at ¶ 35. "He stopped discussing cases [with] and ignored [her]." *Id.* Indeed, "[Lewis's] own Director seemed to be sabotaging her reputation[;] her peer NPs were still refusing to assign her work in the Lab[;] and [Lewis still was] learning the job on the fly as she was denied training." *Id.* at ¶ 36.

On January 9, 2019, Lewis applied for leave under the Family and Medical Leave Act ("FMLA"), to begin March 7, 2019. *Id.* at ¶ 37. Lewis's application for FMLA "made [Kaleida] aware of her disability." *Id.* at ¶ 7. Then, on April 3, 2019, Kaleida terminated Lewis. *Id.* at ¶¶ 7, 38. Lewis was told that the reason for her termination was "Dr. Phadke['s] refusing to sign a practice agreement." *Id.* at ¶ 38. But Dr. Phadke and Lewis had already signed an "active practice agreement[, which] was effective until May 31, 2020." *Id.*

## LEGAL STANDARD

To survive a motion to dismiss, a complaint must include sufficient factual matter, accepted as true, "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

## DISCUSSION

### I.   DISCRIMINATION CLAIMS

Because it involves employment discrimination, this case invokes the burden-shifting framework first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973).[4]  Under the *McDonnell Douglas* framework, a plaintiff first must establish a *prima facie* case of unlawful discrimination.  *See Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015).  To state such a *prima facie* case, the plaintiff must show "(1) that she is a member of a protected class; (2) that she was qualified for employment in the position; (3) that she suffered an adverse employment action; and [(4) that she has] some minimal evidence suggesting an inference that the employer acted with discriminatory motivation."  *Id.*  If she meets her burden, the defendant is presumed to have unlawfully discriminated against her, and the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *Id.* If the defendant makes that showing, the burden shifts back to the plaintiff to show that the defendant's stated reason is pretextual.  *Id.* at 307-08.

What that means in the pleading context has changed over the years.  In *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), the Supreme Court held that the *McDonnell Douglas* line of cases established "an evidentiary standard, not a pleading requirement," and that a plaintiff alleging discrimination need only "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *Id.* at 510, 512.  "Reading *Swierkiewicz* on its face, it appears to have meant that a Title VII plaintiff is not required to plead facts supporting even a minimal inference of discriminatory intent."  *Littlejohn*, 795 F.3d at 309.

---

[4] Claims brought under Title VII, the ADA, and the ADEA all are evaluated under the *McDonnell Douglas* framework.  *See McDonnell Douglas*, 411 U.S. at 802-04 (Title VII); *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167-68 (2d Cir. 2014) (ADEA); *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999) (ADA).

"But only seven years later, the Supreme Court cast doubt on *Swierkiewicz*'s viability." *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 208 (2d Cir. 2020). In "*Iqbal*, it held that mere notice pleading—the pleading standard underlying *Swierkiewicz*'s analysis— was inadequate, and that '[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678).

Although the Supreme Court has not specified how this plausibility standard affects the *McDonnell Douglas* framework, the Second Circuit has interpreted *Iqbal* as requiring an employment-discrimination plaintiff to plead "enough nonconclusory factual matter to nudge her claim[s] across the line from conceivable to plausible." *Id.* (citations and marks omitted). More specifically, to defeat a motion to dismiss, an employment-discrimination plaintiff alleging gender discrimination under Title VII or disability discrimination under the ADA "need only give plausible support to a minimal inference of discriminatory motivation" behind an adverse employment action. *Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 84 (2d Cir. 2015); *Littlejohn*, 795 F.3d at 306, 311. "[A] plaintiff asserting an employment[-]discrimination complaint [for age discrimination under the ADEA] must plausibly allege that . . . her age was the 'but-for' cause of the adverse action."[5] *Marcus v. Leviton Mfg. Co.*, 661 F. App'x 29, 31-32 (2d Cir. 2016) (summary order). "An inference of discrimination can arise from circumstances including, but not limited to, [1] 'the employer's criticism of the plaintiff's

_____

[5] For some forms of discrimination—such as discrimination covered by Title VII or the ADA—"the plaintiff's membership in a protected class need only be *a* motivating factor in the adverse employment action taken; for age discrimination claims, however, the age of the plaintiff must be the 'but-for' cause." *Marcus*, 661 F. App'x at 23, n.1 (emphasis in original).

performance in ethnically degrading terms; [2] its invidious comments about others in the employee's protected group; [3] the more favorable treatment of employees not in the protected group; [4] the sequence of events leading to the plaintiff's discharge'[; or 5] . . . when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class.'" *Littlejohn*, 795 F.3d at 312-13.

### A. Disability

To state a *prima facie* case of discrimination under the ADA, a plaintiff must show that: (1) her employer is subject to the ADA; (2) she is disabled within the meaning of the ADA; (3) she is otherwise qualified to perform the essential functions of her job with or without accommodation; and (4) she suffered an adverse employment action because of her disability. *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).

The ADA defines "disability" to mean "a physical or mental impairment that substantially limits one or more major life activities of [an] individual; . . . a record of such an impairment; or . . . being regarded as having such an impairment." 42 U.S.C. § 12102(1). The statute provides the following non-exhaustive list of major life activities: "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A). "An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability." *Id.* § 12102(4)(C). "A 'temporary impairment' lasting only a few months," however, "is, 'by itself, too short in duration . . . to be substantially limiting.'"

*De La Rosa v. Potter*, 427 F. App'x 28, 29 (2d Cir. 2011) (summary order) (quoting *Adams v. Citizens Advice Bureau*, 187 F.3d 315, 316-17 (2d Cir. 1999)).

"[A] plaintiff [must] do more than simply allude to her impairments in her pleadings; she must plead *how* those impairments significantly impacted major life activities, or she will not survive a motion to dismiss." *Collins v. Giving Back Fund*, 2019 WL 3564578, at *13 (S.D.N.Y. Aug. 6, 2019); *see also Giallanza v. Time Warner Cable*, 2009 WL 857502, at *7 (W.D.N.Y. Mar. 30, 2009) ("[I]t is well settled under federal law that the ADA requires more than a diagnosis of a condition for a person to be considered disabled as that term is defined under the Act."). Indeed, even when it "may be obvious that [a plaintiff's] impairments affect her major life activities, she [still] must plead that those activities have been substantially impaired in order for her to be considered disabled." *Delgado v. Triborough Bridge and Tunnel Auth.*, 485 F. Supp. 2d 453, 459 (S.D.N.Y. 2007).

Here, Lewis has pleaded only that she has the physical impairments of "chronic migraines and cervicalgia," Docket Item 1 at ¶ 3; she does not say—or include any facts from which the Court can infer—that these diagnoses substantially limit her ability to perform any major life activities. Indeed, she has not even hinted at how those alleged "disabilities," *see id.*, affect her. Lewis therefore has not pleaded that she has a disability within the meaning of the ADA. *See Giallanza*, 2009 WL 857502, at *7; *Dechberry v. New York City Fire Dep't*, 124 F. Supp. 3d 131 (E.D.N.Y. 2015) ("Without any factual specificity as to the alleged disability claimed and the major life activities affected, the [c]omplaint fails to plead that plaintiff was disabled.").

Lewis also has not pleaded "a record of" chronic migraines and cervicalgia as disabling impairments or that Kaleida regarded her as having such impairments. *See* 42 U.S.C. § 12102(1)(B)-(C). To show a record of impairment, a plaintiff must establish that she "has a history of an impairment that substantially limited one or more major life activities when compared to most people in the general population, or was misclassified as having had such an impairment." 29 C.F.R. § 1630.2(k)(2). Lewis's "failure to plausibly allege a substantial limitation to a major life activity . . . precludes her from asserting that she has a record of disability." *See Kelly v. New York State Office of Mental Health*, 200 F. Supp. 3d 378, 394 (E.D.N.Y. Aug. 9, 2015).

To adequately plead that she is "regarded as having" a disability, 42 U.S.C. § 12102(1), a plaintiff "must allege that [s]he has been subjected to an action prohibited by the ADA . . . because of an actual or perceived impairment that is not both transitory and minor." *See Rodriguez v. Verizon Telecom*, 2014 WL 6807834, at *5 (S.D.N.Y. Dec. 3, 2014). Lewis does not allege that here: she alleges only that she "was qualified for her job and was able to perform the essential duties of her job with reasonable accommodations." Docket Item 1 at ¶ 4. She does not say, for example, that reasonable accommodations were denied to her, nor does she assert that Kaleida limited her duties or otherwise violated the ADA because of her impairments. *Cf. Capobianco v. City of New York*, 422 F.3d 47, 60 (2d Cir. 2005) (finding that a jury could conclude that the defendants perceived the plaintiff as having a disability when they "placed [the plaintiff] on a medical tissue that prohibited all driving, not just night driving[, and for two months] permitted [the plaintiff] to perform only clerical and similar duties,

even though he was fully capable of performing all sanitation worker duties during the day").

Lewis's applying for FMLA leave does not create a record of disability or mean that Kaleida regarded her as disabled. Because a worker may apply for FMLA leave for reasons unrelated to her own health, *see* 29 C.F.R. § 825.101(a), a request for FMLA leave alone cannot establish a disability. And even if it could, Lewis has not alleged any facts suggesting that Kaleida believed she "suffer[ed] from an impairment that would last or could be expected to last over six months." *See Kelly*, 200 F. Supp. 3d at 395 (defining a "transitory impairment" as "'an impairment with an actual or expected duration of [six] months or less'"); *see also Thomsen v. Stantec, Inc.*, 785 F. Supp. 2d 20, 23 (W.D.N.Y. 2011) (explaining that a "temporary inability to work" does not constitute a disability under the ADA).

Lewis has failed to plead that she has a disability within the meaning of the ADA. Of course, that means she also has not pleaded that she suffered an adverse employment action because of her disability. For both those reasons, she has failed to state a claim for discrimination based on disability.

## B. Age

To establish a *prima facie* case of age discrimination under the ADEA, a plaintiff must allege facts plausibly suggesting that: (1) "she was within the protected age group"; (2) "she was qualified for the position"; (3) "she experienced adverse employment action"; and (4) "such action occurred under circumstances giving rise to an inference of discrimination." *Green v. Town of East Haven*, 952 F.3d 394, 403 (2d Cir. 2020).

12

In New York, a plaintiff suing under the ADEA (as well as under Title VII and the ADA) must "file an administrative charge of discrimination with the EEOC [or the New York State Division of Human Rights ("NYSDHR")] no more than 300 days after the alleged discriminatory act to maintain an action in federal court." *Ellis v. Delphi Corp.*, 2009 WL 3671371, at *2 (W.D.N.Y. Oct. 29, 2009); *Jiles v. Rochester Genesee Reg'l Transp. Auth.*, 217 F. Supp. 3d 688, 690-91 ("For purposes of the filing deadline, a complaint filed with the NYSDHR 'is considered to be cross-filed with the EEOC.'"). This requirement is "strictly enforced" and applies "to each discrete act of alleged discrimination." *Id.* at *2-*3. "Discrete acts of discrimination include 'termination, failure to promote, denial of transfer, or refusal to hire,' as well as disciplinary actions such as suspensions and the denial of training.'" *Id.* at *3 (citing *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002)).

Lewis filed a charge of discrimination with the NYSDHR on November 8, 2019, Docket Item 1 at ¶ 6(1), and the "matter was cross filed with the [EEOC]," *id.* at ¶ 7(1). Therefore, any claim based on a discrete act of discrimination that occurred more than 300 days prior—that is, before January 12, 2019—is time barred.

Lewis alleges that Kaleida began discriminating against her based on her age in November 2017, on her "first day" at Gates Vascular. *Id.* at ¶¶ 10-11. And many of Lewis's allegations involve Kaleida's failure to train her or to remedy the inadequate training that she received. *See id.* at ¶¶ 13-14, 18. While not all allegations are dated, any discrete acts of discrimination during Lewis's training and orientation period certainly occurred before January 12, 2019, and are time barred. *See id.* at ¶ 10 (training period starting in November 2017). The same likely is true of Lewis's claim in

connection with any discipline stemming from the "winter [] 2018" incident. *Id.* at ¶¶ 32-34.

The rest of Lewis's allegations are undated and do not refer to the training period, so this Court cannot determine whether those claims also are time barred. For example, Lewis does not allege when the other NPs "badgered" her to input her vacation time, *id.* at ¶ 15; when she did not have a designated work area, *id.*; when another NP pushed her belongings off a table, *id.*; when Lewis was denied lunch breaks, *id.* at ¶¶ 16-17; or when Lewis finally was trained in the lab, *id.* at ¶¶ 21-22.

The Court need not determine whether any discrete acts of discrimination arising from these incidents occurred after January 12, 2019, however, because Lewis has failed to "plausibly allege that . . . her age was the 'but-for' cause of" this behavior, let alone the but-for cause of any related acts of discrimination. *See Marcus*, 661 F. App'x at 31-32. Lewis does not allege that younger nurses were free from harassment or that they received better training; that "invidious comments" were made about Lewis's age; or anything else that possibly could tie discrimination related to the complained of behavior to her age. *See Littlejohn*, 795 F.3d at 312-13.

In fact, the complaint suggests that it actually was Lewis's *seniority*—not her age—that triggered the NPs' behavior. *See* Docket Item 1 at ¶ 6 ("[Lewis's] age was, in part, the cause of the Nurse Practitioners actions against [her] *due to the seniority benefits* such as vacation priority.") (emphasis added). But "'seniority is not a sufficiently accurate indicator of age' that, by itself, can support an inference that adverse actions based on seniority necessarily evidence age discrimination." *Cross v. New York City Transit Auth.*, 417 F.3d 241, 250 (2d Cir. 2005); *see also Ludovicy v.*

*Dunkirk Radiator Corp.*, 922 F.2d 109, 111 (2d Cir. 1990) ("Because 'seniority as a function of age is dependent upon the age at which the employee began to work for the company,' employees with greater seniority are not necessarily older than employees with less. Moreover, greater seniority does not mean that an employee has necessarily reached the age of 40, the minimum age for protection under the ADEA.") (citations omitted)). So Lewis has not plausibly alleged that her age had anything to do with any allegations she makes.

In sum, many of Lewis's age-discrimination allegations are time barred. And those that are not fail to state a claim for age discrimination sufficient to withstand a motion to dismiss.

### C. Gender

To establish a *prima facie* case of gender discrimination under Title VII, a plaintiff must show that "she was treated less favorably than comparable male employees in circumstances from which a gender-based motive could be inferred." *Montana v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir. 1989). "When considering whether a plaintiff has raised an inference of discrimination by showing that she was subjected to disparate treatment, . . . the plaintiff must show she was 'similarly situated in all material respects' to the individuals with whom she seeks to compare herself." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).

Lewis alleges "disparate treatment regarding attendance" compared to her "male co-worker, John Hawk," who left "early during his shift and affect[ed] other's [sic] work." Docket Item 1 at ¶ 25. But Lewis does not allege that she was similarly situated to Hawk—for example, that she tried to leave work early but was prevented from doing so

or was reprimanded in some way.  In fact, Lewis does not even allege that she and Hawk held the same position; were subject to the same work rules; performed the same job; or were similar in any way other than being co-workers.  *See Graham*, 230 F.3d at 39 (explaining that a plaintiff must be "similarly situated in all material respects" to those with whom she seeks to compare herself).  So Lewis's allegations regarding Hawk fail to state a claim for gender discrimination.

Moreover, the complaint does not link any allegedly discriminatory behavior—such as Dr. Phadke's "treating [Lewis] differently" or the NPs' denying Lewis lunch breaks—to Lewis's gender.  *See id.* at ¶¶ 16-17, 36.  Nor does it allege any other facts to plausibly support "a minimal inference of discriminatory motivation" based on gender.  *See Littlejohn*, 795 F.3d at 306, 311.  Therefore, the complaint fails to state a claim for gender discrimination.[6]

## II. HOSTILE WORK ENVIRONMENT CLAIM

Under Title VII, the ADA, and the ADEA, "an employee seeking to bring a hostile work environment claim must show [1] that she . . . is a member of a protected class; [2] that she suffered unwelcomed harassment; [3] that she was harassed because of her membership in a protected class; and [4] that the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment."  *Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 584 (S.D.N.Y. 2008) (Title VII and ADA); *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir 2003)

---

[6] For the reasons already explained, any gender-discrimination claims based on acts of discrimination that occurred before January 12, 2019, are time barred. *See supra* at 12-13.

(Title VII and ADEA). "This test has objective and subjective elements: the misconduct must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Courts look at the totality of the circumstances and examine factors including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

Although "[t]he standard for a hostile work environment claim is a demanding one" and "Title VII is not intended to create a code of civility," *Scott v. Memorial Sloan-Kettering Cancer Center*, 190 F. Supp. 2d 590, 599 (S.D.N.Y. 2002), the Second Circuit "ha[s] repeatedly cautioned against setting the bar too high," *Terry*, 336 F.3d at 148.

> [W]hile a mild, isolated incident does not make a work environment hostile, the test is whether "the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." The environment need not be "unendurable" or "intolerable." Nor must the victim's "psychological well-being" be damaged. In short, "'the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases.'"

*Id.* at (citations omitted).

"A plaintiff must also demonstrate that she was subjected to the hostility because of her membership in a protected class." *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999). "In other words, an environment which is equally harsh for both men and women or for both young and old does not constitute a hostile working

environment under the civil rights statutes." *Id.* (citing *Oncale v. Sundowner Offshore Servs., Inc., et al.*, 523 U.S. 75 (1998)).

"While discrete claims of discrimination and retaliation must be brought within the 300-day limitations period to be actionable, a different rule applies with regard to hostile work environment claims." *Zoulas v. New York City Dep't of Edu.*, 400 F. Supp. 3d 25, 50 (S.D.N.Y. 2019) (citation omitted). "Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct." *Morgan*, 536 U.S. at 115. Therefore, "as long as any act contributing to the hostile work environment claim falls within the 300-day period, 'the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.'" *Zoulas*, 400 F. Supp. 3d at 50 (citing *Morgan*, 536 U.S. at 117).

Lewis alleges that Kaleida created a "hostile work environment due to her age." Docket 1 at ¶ 6. She certainly has satisfied the subjective prong: there is no question that Lewis "subjectively perceive[d her] environment [at Kaleida] to be abusive." *See Alfano*, 294 F.3d at 374. Whether Lewis has pleaded facts sufficient to satisfy the objective prong is a more difficult question.

But all that is of no moment because Lewis has not tied any of Kaleida's conduct to her age. In fact, the only non-conclusory statement regarding Lewis's age in the complaint is that, at the time of her transfer to Gates Vascular, Lewis was the "third oldest [NP] in the department." *See* Docket Item 1 at ¶ 12. Lewis has not pleaded any facts to suggest that Kaleida's working environment was worse for older nurses than younger ones. *See Brennan*, 192 F.3d at 318 ("[A]n environment which is equally harsh for both . . . young and old does not constitute a hostile working environment."). And

the rest of her allegations center on her seniority, which, as previously explained, "is not a sufficiently accurate indicator of age" alone to plead an age-discrimination claim. *See supra* at 13-14; *see also Cross*, 417 F.3d at 250.

The complaint therefore fails to state a claim for hostile work environment based on age.[7]

## III.   RETALIATION CLAIMS

To establish a *prima facie* case of retaliation under Title VII and the ADA, "a plaintiff must establish that (1) the employee was engaged in an activity protected by the ADA [or Title VII], (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action." *Sarno v. Doublas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999); *Terry*, 336 F.3d at 141. Retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *Id.*

"'Protected activity' includes opposition to a discriminatory employment practice," *Hubbard v. Total Commc'ns., Inc.*, 347 F. App'x 679, 680-81 (2d Cir. 2009), including "informal protests of discriminatory employment practices, [such as] making complaints to management," *Belton v. Borg & Ide Imaging, P.C.*, 2021 WL 98392, at *7 (W.D.N.Y. Jan. 12, 2021) (citation omitted). "But such [informal] complaints must be 'sufficiently specific so that the employer is put on notice that the plaintiff believes she is being

---

[7] To the extent the complaint can be read to plead a hostile work environment based on gender or disability, those claims are insufficiently pleaded for reasons already explained. *See supra* at 10-12 (disability discrimination); *id.* at 14-15 (gender discrimination).

discriminated against on *the basis of* a protected characteristic." *Id.* (internal marks omitted) (emphasis added) (citing *Jaeger v. North Babylon Union Free Sch. Dist.*, 191 F. Supp. 3d 215, 232 (E.D.N.Y. 2016); *Brummell v. Webster Cent. Sch. Dist.*, 2009 WL 232789, at *5 (W.D.N.Y. Jan. 29, 2009)). In other words, "[g]eneralized complaints" are insufficient. *McCullough v. John T. Mather Hospital of Port Jefferson, New York, Inc.*, 2019 WL 1755436, at *8 (Apr. 19, 2019). "To the extent that an employee complains about perceived 'unfair' treatment relating to job responsibility, hiring practices, or corporate policy, but fails to link the treatment to unlawful discrimination or to h[er] protected status, [s]he fails to establish that [s]he was engaged in [a] protected activity." *Id.* (citation omitted).

Here, the complaint alleges that Lewis complained to her manager about the inadequate training, about the failure to provide lunch breaks, and generally about the "discriminatory hostile environment she was being subjected to." *See* Docket Item 1 at ¶¶ 6, 18. But the complaint does not allege that Lewis complained that she was "being discriminated against on the basis of" her gender or disability. *See Belton*, 2021 WL 98292, at *7. In fact, Lewis does not allege that Kaleida even knew about her disability until January 19, 2019, when she applied for FMLA leave. Docket Item 1 at ¶ 7. So Lewis's complaint to Palisano "at the conclusion of her orientation" about the "hostile work environment," *id.* at ¶ 18, could not have put Palisano on notice that Lewis believed she was being discriminated against based on her disability, s*ee Belton*, 2021 WL 98292, at *7. Similarly, although Lewis reported Hawk's leaving work early, there is no indication that Lewis believed she was being treated differently than Hawk based on her gender. *See id.* at ¶ 25. In fact, as written, the complaint suggests that Lewis

reported Hawk's behavior because it was affecting her and the other NPs' workloads—not because male nurses were permitted to leave early and female nurses were not. *See id.* ("A male co-worker, John Hawk, was leaving early during his shift and *affecting other's work* [sic].") (emphasis added).

Because Lewis has failed to plead that she engaged in a protected activity, she has failed to state a retaliation claim under either the ADA or Title VII.

## IV.    LEAVE TO AMEND

Lewis has not asked for leave to amend her complaint. Nevertheless, because leave to amend should be "freely given" whenever a complaint is dismissed, *see McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007), Lewis may file an amended complaint, within 60 days, that corrects the deficiencies noted above. Leave to amend any claims based on discrete acts of discrimination that occurred before January 12, 2019, is denied, however, because those claims are time barred. *See Cuoco v. Moritsugu*, 222 F.2d 99, 112 (2d Cir. 2000) (Leave to amend pleadings may be denied when any amendment would be "futile.").

## CONCLUSION

For the reasons stated above, Kaleida's motion to dismiss, Docket Item 8, is GRANTED IN PART. Lewis's claims based on discrete acts of discrimination that occurred before January 12, 2019, are dismissed. The remainder of Kaleida's motion to dismiss will be granted unless Lewis amends her complaint, within 60 days, to correct the deficiencies noted above. No later than 30 days after any amended complaint is filed, Kaleida may answer, move against, or otherwise respond to the amended

complaint.  If Lewis does not file an amended complaint within 60 days, then her

complaint will be dismissed, and the Clerk of the Court shall close this case without

further order.


SO ORDERED.

Dated:   June 24, 2021
            Buffalo, New York


                                            /s/ Lawrence J. Vilardo
                                            LAWRENCE J. VILARDO
                                            UNITED STATES DISTRICT JUDGE